**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

OLIVIA RUX, et al.,

      Plaintiff,

      v.                                 Civil Action No. 2:04cv428

THE REPUBLIC OF SUDAN,

      Defendant.

**MEMORANDUM OPINION AND ORDER**

Now before the Court is Defendant Republic of Sudan's Motion to Dismiss Plaintiffs'

Amended Complaint with Prejudice ("Motion to Dismiss").  (Doc. No. 41.)  The Motion urges

dismissal on six of the seven grounds available under Rule 12(b) of the Federal Rules of Civil

Procedure: 1) lack of jurisdiction over the subject matter, 2) lack of jurisdiction over the person,

3) improper venue, 4) insufficiency of process, 5) insufficiency of service of process, and 6)

failure to state a claim upon which relief can be granted.  For the reasons that follow, the Motion

to Dismiss is **DENIED** on grounds 1, 2, 3, 4, and 5.[1]  The Motion to Dismiss on ground 6, failure

to state a claim upon which relief can be granted, is **TAKEN UNDER ADVISEMENT** until

sometime after the Republic of Sudan answers the Complaint.

---

[1]Grounds 2, 4, and 5, involving personal jurisdiction and sufficiency of process and service of process, were addressed and resolved at the June 30, 2005 hearing on Defendant's Motion to Vacate Entry of Default and Cancel Evidentiary Hearing.  (Minute Order of June 30, 2005, Doc. No. 35.)  See infra Parts I.B. and III.A and B.  Defendant has reasserted those grounds in this Motion to Dismiss in spite of the Court's prior ruling.  (Def.'s Memo. in Supp. of Mot. at 1, n.2, Doc. No. 42.)  This Memorandum Opinion and Order, in addition to resolving Sudan's subject matter jurisdiction attack and other issues, memorializes the reasons underlying the Court's prior ruling on personal jurisdiction and sufficiency of process and service of process.

Also before the Court is Defendant Republic of Sudan's Motion to Amend the Court's

Order of July 19, 2005, to Extend the Date for Filing Defendant's Answer to Plaintiffs' Amended

Complaint ("Motion to Extend").  (Doc. No. 43.)  The Motion to Extend prays this Court

postpone the September 2, 2005 deadline to answer the Complaint, established by Order of this

Court on July 19, 2005 (Doc. No. 39 at 3, ¶ 5) until ten days after the issuance of this

Memorandum Opinion and Order.  Plaintiffs do not oppose the Motion to Extend.  For the

reasons that follow, the Motion to Extend is **GRANTED**, subject to the conditions explained

below.


I.       **BACKGROUND**

A.       **The Complaint**

On October 12, 2000, the USS Cole, an American warship home ported in Norfolk,

Virginia and temporarily berthed at port in Aden, Yemen, was bombed by Al-Qaeda, a global

terrorist organization.  Seventeen American sailors stationed aboard the Cole were killed as a

result of the bombing.  More than fifty surviving family members of the deceased sailors

(collectively the "Plaintiffs")[2] brought suit in this Court on July 16, 2004 to recover damages

allegedly arising from the sailors' deaths.  Plaintiffs' core factual allegation[3] is that the

---

[2]The Plaintiff-family members include widows, minor children, siblings, and parents.  In addition, one "long-term companion" and mother of the child of a decedent is also named as a plaintiff.  (Am. Compl. ¶ 10, Doc. No. 10.)  Originally, family members of just seven of the deceased sailors joined in this lawsuit.  Through four subsequent amendments to the Complaint, family members of all seventeen deceased sailors have been added as plaintiffs.

[3]The facts alleged in Plaintiffs' Complaint are taken as true for the purpose of resolving the Motions presented to the Court.  See infra Part II.A.  This Memorandum Opinion and Order contains no findings of fact.

Defendant, the Republic of Sudan ("Sudan"), "provided material support in the form of funding, direction, training and cover to Al-Qaeda, a worldwide terrorist organization whose operatives facilitated the planning and execution of the bombing of the USS Cole." (Am. Compl. at 2, Doc. No. 10.)

Though foreign states are ordinarily entitled to immunity from suit in United States courts, Plaintiffs allege that Sudan's actions resulted in a statutory waiver of sovereign immunity pursuant to the "terrorist exception" contained in the Foreign Sovereign Immunities Act ("FSIA"). See 28 U.S.C. § 1605(a)(7). Plaintiffs allege that they are entitled to relief under 1) state common law or statutory law for wrongful death for the State of residence for each victim killed in the bombing of the USS Cole; 2) state common law or statutory law for intentional infliction of mental or emotional distress for each Plaintiff; 3) state common law or statutory law for battery for each Plaintiffs' decedent; 4) federal common law for loss of solatium for each Plaintiff as set forth in Surrette v. Islamic Republic of Iran, 231 F. Supp.2d 260 (D.D.C. 2002); and, 5) the Restatement (Second) of Torts § 46(2). (Proposed Am. to Supp. Am. Compl. at 2, Pt. VI, Doc. No. 28.) Plaintiffs contend that they are entitled to damages for loss of solatium or consortium, loss of love, affection, companionship, advice, and comfort as a consequence of wrongful death (Am. Compl. ¶ 32, Doc. No. 10), and for loss of support due to the loss of earnings and earning capacity. (Proposed Am. to Supp. Am. Compl. at 2, Pt. II, Doc. No. 28.) They seek millions of dollars in alleged damages.

**B. Procedural History**

This lawsuit was initiated on July 16, 2004. Four amendments have been made to the original Complaint (collectively referred to as "the Complaint"). (See Court Order of June 15,

3

2005 at 1, Doc. No. 27; see also Amendment Filings and Orders, Doc. Nos. 8, 10, 11, 12, 14, 15, 16, 22, 25, 28.)  Service of process was made on the Republic of Sudan on December 16, 2004. (Doc. No. 17.)  As of more than 60 days after service of process, Sudan had not appeared to defend the suit.  Consequently, the Clerk of the Court noted Sudan's default in the record on February 16, 2005.  (Doc. No. 18.)  See 28 U.S.C. § 1608(d); Fed. R. Civ. P. 55(b)(1).  Soon thereafter, on February 25, 2005, Plaintiffs moved the Court to enter a default judgment.  (Doc. No. 20.)  See 28 U.S.C. § 1608(e); Fed. R. Civ. P. 55(b)(2).  This Court conducted a telephonic status conference with counsel for Plaintiffs on March 16, 2005, at which time a default judgment hearing was scheduled for August 23, 2005 and Plaintiffs were ordered to submit a memorandum of law concerning the appropriate burden of production and proof on liability and damages in cases involving a foreign sovereign in default.[4]  In spite of Sudan's default, the Court also directed Plaintiffs to provide Sudan with notice of any depositions they intended to take. See Fed. R. Civ. P. 30; E.D. Va. Local R. Civ. P. 30(h).  Subsequently, on June 15, 2005, upon Plaintiffs' (Revised) Motion for Leave to Supplement Amended Complaint (Doc. No. 25), this Court entered an Order granting leave to amend subject to proper service of process.  (Doc. No. 27.)  The Court also directed Plaintiffs to prepare a final pretrial order, in accordance with local practice, in advance of the default judgment hearing (then) scheduled for August 23, 2005.  (Id.) Each of these steps was taken to safeguard the rights of the (then) defaulted party, Sudan.  See E.D. Local R. Civ. P. 16(A).

---

[4]The Court took this step in light of conflicting caselaw concerning the burden of production and proof in the default context in cases brought pursuant to the FSIA.  Contrast Cronin v. Islamic Republic of Iran, 238 F. Supp.2d 222, 224 (D.D.C. 2002) with Smith ex rel. Smith v. Islamic Emirate of Afghanistan, 262 F. Supp.2d 217, 223 (S.D.N.Y. 2003); also compare 28 U.S.C. § 1608(e) with Fed. R. Civ. P. 55(e).

On June 17, 2005, the Republic of Sudan entered a general appearance by filing a Motion to Vacate Entry of Default and Cancel Evidentiary Hearing ("Motion to Vacate Default"), which "respectfully move[d] the Court for an Order vacating the Entry of Default and Canceling the Evidentiary Hearing currently set for August 23, 2005 . . . ." (Doc. No. 29.)  The Motion to Vacate Default was accompanied by a separate memorandum of law in support (Doc. No. 30) containing a personal jurisdiction plea alleging that the process and service of process utilized by Plaintiffs were insufficient.  Critically, Sudan's personal jurisdiction plea was not raised in its initial motion paper.

A hearing was conducted on Sudan's Motion to Vacate Default on June 30, 2005.  Before entertaining oral argument, the Court confirmed that counsel for Defendant, the law firm of Hunton & Williams, was authorized by Defendant to enter an appearance and that they would remain as counsel throughout the proceedings.  The need to verify Hunton & Williams' authority to appear was prompted by developments in another civil action involving Sudan that is pending before the United States District Court for the District of Columbia.  See James Owens, et al v. Republic of Sudan, et al, Civil Action No. 01-2244 (JDB).  In Owens, Hunton & Williams moved to withdraw from representation on the grounds that Sudan failed to communicate adequately with counsel and refused to pay legal fees.  (Pl.'s Memo. in Opp. to Def.'s Mot. to Vacate Default, Exh. 3, Doc. No. 32.)  Prior to considering whether Sudan should be relieved from default, this Court was therefore compelled to ensure that Hunton & Williams possessed the requisite authority to act on Sudan's behalf and to confirm that counsel intended to participate in the case from beginning to end.  As the Court explained to counsel at the hearing, in the Eastern District of Virginia, "[i]f you're here, you're here."  (Tr. of Hrg. at 5, Doc. No. 36.)  See E.D. Va.

Local R. 83.1(G).

After making the necessary verification, the Court relieved Sudan from default. Plaintiffs did not object. (Tr. of Hrg. at 32.) Additionally, the Court addressed the personal jurisdiction plea raised by Sudan in its memorandum accompanying the Motion to Vacate Default. (See id. at 6-31.) Subject to the reasons stated in this Memorandum Opinion and Order,[5] the Court concluded that: "1) Defendant waived personal jurisdiction by entering an appearance to vacate default; 2) Plaintiffs' service of process was valid pursuant to the requirements of the Foreign Sovereign Immunities Act, Federal Rules of Civil Procedure, Virginia statute, and other reasons to follow in a written opinion." (Minute Order of June 30, 2005, Doc. No. 35.)

Finally, at the June 30, 2005 hearing, Sudan informed the Court and Plaintiffs that it intended to attack this Court's subject mater jurisdiction by raising a plea of sovereign immunity. (Tr. of Hrg. at 31-2, Doc. No. 36.) Due to the types of issues involved and the variety of ways in which subject matter jurisdiction may be challenged based on sovereign immunity,[6] the Court

---

[5]In addition to resolving the Motion now before the Court, this Memorandum Opinion and Order also explains the reasons for the Court's June 30, 2005 Minute Order. See supra note 1; infra Part III. A and B.

[6]"In order to preserve the full scope of [sovereign] immunity, the district court must make the 'critical preliminary determination' of its own jurisdiction as early in the litigation as possible; to defer the question is to 'frustrate the significance and benefit to immunity from suit.'" Phoenix Consulting, Inc. v. Republic of Angola, 216 F.3d 36, 39 (D.C. Cir. 2000). In fact, the initial inquiry is viewed as so important that "[o]rders denying sovereign immunity are immediately appealable collateral orders." Eckert Intern., Inc. v. Gov't of Sovereign Democratic Republic of Fiji, 32 F.3d 77, 79 (4th Cir. 1994) (citations omitted). Furthermore, challenges to subject matter jurisdiction based on sovereign immunity can take either of two forms, one of which requires jurisdictional discovery, and one of which prohibits it. See Phoenix Consulting, 216 F.3d at 40. As a result of the nascent thicket presented by Sudan's anticipated sovereign immunity plea, the Court afforded the parties the opportunity to propose scheduling orders on how to approach the subject matter jurisdiction challenge before proceeding.

6

ordered the parties to submit proposed scheduling orders for resolving this threshold

jurisdictional question.  (Id. at 32-49.)  A telephonic status conference to establish a scheduling

order was scheduled for July 19, 2005.

The parties submitted proposed scheduling orders to the Court in advance of the July 19,

2005 telephonic status conference.  Importantly, Sudan represented to the Court that it intended

to challenge subject matter jurisdiction as a matter of law, based only on the legal sufficiency of

the factual allegations contained in the Complaint.  (Tr. of Hrg. at 5-6, Doc. No. 40; Def.'s

Memo. Regarding Procedures for Subj. Matter J. Challenge at 2, Doc. No. 37.)  As resolution of

such a challenge does not require consideration of any evidence outside the pleadings, see infra

Part II.A., jurisdictional discovery was deemed unnecessary.  Based on this, the Court concluded

that the scheduling proposals submitted by both parties were unacceptable because they

unnecessarily delayed resolution of the subject matter jurisdiction issue.  (Id. at 3.)  At that point

in time, more than one year had elapsed since the filing of the Complaint and the case had

progressed nowhere.[7]  Thus, the Court entered its own scheduling order to ensure swift resolution

of the threshold question of subject matter jurisdiction. (Court Order of July 19, 2005 at 2-3,

Doc. No. 39.)  The Court also entered a provisional scheduling order pursuant to Rules 16(b) and

---

[7]The Eastern District of Virginia adheres strictly to the principle of "Justice Delayed, Justice Denied," which is etched into the face of the Albert V. Bryan federal courthouse in Alexandria, Virginia.  Based on internal judicial management statistics, the average time between the filing of a case and its completion in 2004 was less than six months.  For civil cases proceeding to trial during that year, the average time between filing and completion was approximately nine months.  Moreover, in 2004 there were only thirteen cases that had been pending for more than three years in the entire Eastern District of Virginia.  At more than one-year in duration, this case is presently the oldest active matter on the undersigned Judge's docket.  Cf. Safer Display Tech., Ltd. v. Tatung Co., 227 F.R.D. 435, 442 (E.D. Va. 2004) (Doumar, J.) (expressing this Court's intolerance of unnecessarily long jurisdictional forays).

26(f) of the Federal Rules of Civil Procedure, conditioned, of course, on a finding that Sudan is not entitled to sovereign immunity.  (Id. at 8.)  See also E.D. Local R. Civ. P. 16(B).

On August 3, 2005, pursuant to this Court's Order of July 19, 2005, Sudan filed the Motion to Dismiss Plaintiff's Amended Complaint with Prejudice (the "Motion to Dismiss") (Doc. No. 41) now before the Court.  The Motion raises six of the seven grounds for dismissal available in Rule 12(b) of the Federal Rules of Civil Procedure: 1) that the Court lacks subject matter jurisdiction because Sudan is immune from suit; 2) that Sudan lacks sufficient minimum contacts with the forum state to establish personal jurisdiction; 3) that the Eastern District of Virginia, Norfolk Division, is an improper venue; 4) that Plaintiffs' process is legally insufficient; 5) that Plaintiffs' service of process is legally insufficient; and, 6) that Plaintiffs have failed to state a claim upon which relief can be granted because their claim is barred by the allegedly applicable limitations period, as well as for other reasons.[8]

Additionally, Sudan also filed a Motion to Amend the Court's Order of July 19, 2005, to Extend the Date for Filing Defendant's Answer to Plaintiff's Amended Complaint (the "Motion to Extend").  (Doc. No. 43.)  The Motion to Extend requests that the Court grant Sudan ten days after issuance of this Memorandum Opinion and Order to answer the Complaint, rather than enforce the date of September 2, 2005 established by the July 19, 2005 Scheduling Order.  (Doc. No. 39 at 3, ¶ 5.)  Plaintiffs do not oppose this Motion.

The Court entertained oral argument on August 23, 2005 on both pending Motions, which are accordingly ripe for judicial resolution.

---

[8]See supra note 1.

## II.     SUBJECT MATTER JURISDICTION

The Republic of Sudan contends that it is entitled to sovereign immunity and that, as a result, this Court lacks subjection matter jurisdiction pursuant to the requirements imposed by the FSIA.  Sudan's subject matter jurisdiction challenge is strictly legal in nature: accepting the facts alleged in the Complaint as true, Sudan argues that Plaintiffs have failed to establish the requisite elements of subject matter jurisdiction.

### A.     Legal Standard

It goes without saying that a federal district court is "obliged to dismiss a case whenever it appears the court lacks subject matter jurisdiction."  Lovern v. Edwards, 190 F.3d 648, 654 (4th Cir. 1999); see also Sigmon Coal Co., Inc. v. Apfel, 226 F.3d 291, 299 (4th Cir. 2000); Fed. R. Civ. P. 12(h)(3).  Indeed, the "'nature and limits of the judicial power of the United States'" require that federal jurisdiction be established at the outset, or as near to the outset as possible, of any case.  Steel Co. v. Citizens for a Better Env't, 424 U.S. 83, 94-95 (1998) (quoting Mansfield, C. & L.M.R. Co. v. Swan, 111 U.S. 379, 382 (1884)).  A threshold jurisdictional inquiry is of special importance where foreign sovereign immunity is involved: "In order to preserve the full scope of that immunity, the district court must make the 'critical preliminary determination' of its own jurisdiction as early in the litigation as possible; to defer the question is to 'frustrate the significance and benefit to immunity from suit.'"  Phoenix Consulting, Inc. v. Republic of Angola, 216 F.3d 36, 39 (D.C. Cir. 2000) (quoting Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438, 449 (D.C. Cir. 1990)); see also Velasco v. The Gov't of Indonesia, 370 F.3d 392, 398 (4th Cir. 2004).  In fact, the threshold jurisdictional determination in FSIA cases has been deemed so important as to warrant interlocutory appellate review under the collateral

order review doctrine.  Eckert Intern., Inc. v. Gov't of Sovereign Democratic Republic of Fiji, 32 F.3d 77, 79 (4th Cir. 1994) (citations omitted); see also supra note 6.

Challenges to subject matter jurisdiction under the FSIA may take one of two forms. "[T]he defendant may challenge either the legal sufficiency or the factual underpinning of an exception, and how the district court proceeds to resolve [the challenge] depends upon whether the motion presents a factual challenge."  Phoenix Consulting, 216 F.3d at 40.  In this case, the Republic of Sudan has challenged only the legal sufficiency of Plaintiffs' jurisdictional allegations, claiming that the factual allegations in the Complaint, even if true, do not permit a waiver of sovereign immunity.  The sufficiency of the factual allegations contained in a complaint is a question of law.  Accordingly, "the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff."  Id. (citations omitted).[9]  Just as with a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, "dismissal is warranted if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief."  Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 93 (D.C. Cir. 2002).

**B.    The Statutory Framework**

**1.    The FSIA as a Jurisdictional Statute**

---

[9]While ordinarily a court may peer beyond the pleadings to assess whether it has jurisdiction over the subject matter, see Velasco, 370 F.3d at 398, a court is not authorized to do so upon a plea of sovereign immunity based only on the legal sufficiency of the allegations pled in the complaint.  See Phoenix Consulting, 216 F.3d at 40; cf. Foremost-McKesson, 905 F.2d at 449.

The FSIA[10] provides that "[s]ubject to existing international agreements to which the United States is a party . . . a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter." 28 U.S.C. § 1604.  Thus, a foreign state is immune from suit in American courts unless one of the nine exceptions to foreign sovereign immunity contained in §§ 1605 to 1607 of the FSIA apply.[11]  In the event that one of the exceptions does apply, federal district courts have original jurisdiction over the subject matter.  Id. § 1330(a).[12]  Sections 1604 and 1330(a) of the FSIA thereby operate in tandem to "condition the subject matter jurisdiction of the federal and state courts upon the existence of one of the exceptions to immunity set forth in the FSIA."  Velasco, 370 F.3d at 39.  In that manner, "[t]he FSIA provides the sole source of subject matter jurisdiction in suits against a foreign state."  Id. (citing Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434-39 (1989)).  Accordingly, determining whether a foreign

---

[10]The Foreign Sovereign Immunities Act of 1976, Pub. L. 94-583, Oct. 21, 1976, 90 Stat. 2891, 28 U.S.C. §§ 1330, 1602-1611.

[11]Prior to passage of the FSIA in 1976, foreign states were generally afforded sovereign immunity as "a matter of grace and comity on the part of the United States," but not due to "a restriction imposed by the Constitution."  Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 486 (1983).  Generally speaking, courts adopted a "restrictive theory" of foreign sovereign immunity, in which "immunity is confined to suits involving the foreign sovereign's public acts, and does not extend to cases arising out of a foreign state's strictly commercial acts."  Id. at 487. The FSIA essentially codifies the restrictive theory.  Id. at 488.

[12]Section 1330(a) of Title 28, United States Code, provides that:

(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605 - 1607 of this title or under any applicable international agreement.

11

state-defendant is entitled to sovereign immunity is a jurisdictional inquiry.  See id. at 397-98;

Cicippio-Puleo v. Islamic Republic of Iran, 353 F.3d 1024, 1032 (D.C. Cir. 2004) (holding that

28 U.S.C. § 1605(a)(7), the terrorism exception, is a jurisdictional provision); Phoenix

Consulting, 216 F.3d at 39.

### 2. The Terrorism Exception

The FSIA exception at issue in this case is the terrorist exception.  The terrorist exception

was enacted in 1996 as part of the Antiterrorism and Effective Death Penalty Act ("AEDPA").

The terrorist exception waives immunity of foreign states and their agents in any case

> in which money damages are sought against a foreign state for personal injury or death
> that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage
> taking, or the provision of material support or resources (as defined in Section 2339A of
> Title 18) for such an act if such act or provision of material support is engaged in by an
> official, employee, or agent of such foreign state while acting within the scope of his or
> her office, employment, or agency . . .

28 U.S.C. § 1605(a)(7).  For this exception to apply, the foreign state must be designated as a

"state sponsor of terrorism" by the United States State Department, the foreign state must have

been provided with a reasonable opportunity to arbitrate the claim if the alleged act or acts giving

rise to the dispute occurred within the foreign state's territory, and either the claimant or the

victim must be a national of the United States at the time of the alleged act or acts.  Id. §§

1605(a)(7)(A) and (B)(i)-(ii).

### 3. Pleading Requirements

Plaintiffs' Complaint alleges that Sudan is not entitled to sovereign immunity under the

"material support or resources" clause of the terrorist exception.  Sudan, in turn, contends that the

allegations contained in the Complaint, even if true, do not satisfy the jurisdictional requirements

of this clause.  Sudan's contention raises the question: what facts must be pled, and with what degree of specificity must they be pled, to invoke the material support and resources clause of the terrorist exception to foreign sovereign immunity?  This is an issue of first impression within this judicial Circuit.

Since the FSIA is the sole source of subject matter jurisdiction over a foreign state, whether jurisdiction obtains depends on whether the express terms of the relevant statutory provision have been complied with.  In other words, determining the pleading requirements for invoking the material support and resources clause of the terrorist exception is simply a matter of statutory interpretation.  According to the plain terms of § 1605(a)(7), a plaintiff must plead five elements to invoke the material support or resources clause of the terrorist exception: 1) the occurrence of *personal injury* or *death*, 2) *caused by*, 3) the provision of *material support or resources* (as defined by 28 U.S.C. § 2339A), 4) by an *official, employee*, or *agent* of a foreign state, 5) while acting *within the scope* of his office, employment, or agency.

These are the five elements contained within the statute: nothing *less* and nothing *more* will satisfy the requirements of § 1605(a)(7).  See Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there. [citation omitted].");  Duncan v. Walker, 533 U.S. 167, 174 (2001) ("It is our duty to give effect, if possible, to every clause and word of a statute. [internal quotation marks omitted].").  While these elements must be pled for jurisdiction to obtain, "[a] claimant need not set out all of the precise facts on which the claim is based in order to survive a motion to dismiss."  Price, 294 F.3d 82 at 93.

### C.  Discussion and Analysis

### 1.    The Jurisdictional Allegations in the Complaint

Broadly, the Complaint alleges that Sudan "provided material support in the form of
funding, direction, training and cover to Al-Qaeda, a worldwide terrorist organization whose
operatives facilitated the planning and execution of the bombing of the USS Cole." (Am.
Compl. at 2, Doc. No. 10.)  More specifically, Plaintiffs allege the following:

26.   Defendant Republic of Sudan, by and through officials, employees or agents
acting knowingly and willfully, used funds and other assets belonging to the
Republic of the Sudan to provide material support and resources to Osama bin
Ladin and to Al-Qaeda, the perpetrators of the bombing of the USS Cole reference
herein above on October 12, 200 in port in Yemen, which bombing resulted in the
wrongful deaths of the plaintiffs' decedents.  The provision of material support or
resources was engaged in by officials, employees and agents of the Republic of
the Sudan while such officials, employees or agents were acting within the scope
of their office, employment or agency.

27.   The bombing of the USS Cole was an act of international terrorism knowingly and
deliberately aided and abetted by Defendant Republic of the Sudan.  The
providing to Osama bin Ladin of safe harbor and shelter during a period of time
up to and including 1996 and to other members of Al-Qaeda through 2001,
created liability, on the part of Defendant Republic of the Sudan.  Defendant
Republic of the Sudan provided material support and resources to some of the
actual perpetrators of the bombing of the USS Cole.  The Republic of Sudan aided
and abetted the actual perpetrators in carrying out such acts of terrorism.  Agents,
servants or employees of the Republic of the Sudan knew that the acts of Osama
bin Ladin were acts of terrorism designed to cause death or serious injury to the
victims of its terrorism.  Agents, servants or employees of the Republic of the
Sudan participated in the providing of the shelter to Osama bin Ladin and to Al-
Qaeda, the perpetrators of the acts complained of herein.  Among the acts
providing support or resources were the following: (a) the Gum Arabic Company,
Ltd, a company operating in the Republic of Sudan was jointly owned by the
government of Sudan and Osama bin Ladin; (b) use of a diplomatic pouch to send
explosive materials belonging to Osama bin Ladin for Al-Qaeda outside the
Republic of Sudan; (c) the establishment of a bank primarily financed Osama bin
Ladin, the al-Shamal Islamic Bank in Khartoum, which bank is jointly owned by
the Republic of the Sudan; (d) Omar Hassan Ahmad al Bashir, president of the
Republic of Sudan, authorized the entry into the Republic of Sudan by Al-Qaeda
operatives and gave Al-Qaeda special authority to avoid paying taxes and duties
ordinarily due to the Republic of the Sudan; (e) Osama bin Ladin founded Wadi-

al-Aqiq, a trading company which was allowed unrestricted shipping by the Sudanese government; (f) the Sudanese government allowed Osama bin Ladin and Al-Qaeda to operate training camps within the Republic of Sudan for the purpose of training terrorists including training such people in how to manufacture bombs and explosives; (g) the Republic of Sudan failed to comply with UN Security Council Resolutions 1044, 1054 and 1096, which were passed in 1996, and as of April, 2000 continued to harbor various terrorist groups including but not limited to Al-Qaeda; (h) the Sudanese government allowed Al-Qaeda operative Jamal Ahmed al-Fadl to ship four crates of explosive from Sudan to Yemen the site of the bombing of the USS Cole; (i) Defendant Republic of the Sudan has sent its minister of foreign affairs, Mustafa Osman Ismail in May 2003 to the United States to issue a public apology for the prior harboring and assisting of terrorists including but not limited to Al-Qaeda and Osama bin Ladin, which apology was aired on CSPAN.

. . .

29.    The attack on October 12, 2000 against the USS Cole while in a harbor in the waters of Yemen was part of a decade-long plan of international terrorism directed at the United States of America and its citizens that was conceived and implemented pursuant to an international conspiracy of terrorists, usually referred to as Al-Qaeda, which conspiracy was joined and supported by Defendant Republic of the Sudan.  Al-Qaeda could not have existed or planned its acts of terrorism, including an act directed at an American Naval vessel, without the support of state sponsors of terrorism including Defendant Republic of the Sudan. Between 1991 and 1996 Defendant Republic of the Sudan provided shelter and a safe haven for the operations of Al-Qaeda's leader, Osama bin Ladin.  After 1996, Defendant continued to render support and shelter of other Al-Qaeda operatives including Yemeni militant terrorists who planned the attack on the USS Cole.

30.    Commencing in 1991, Osama bin Ladin and his Al-Qaeda organization were welcomed in the Republic of Sudan by the leader of the National Islamic Front Haza al Turabi and the President of the Republic of the Sudan, Omar Bashir, who provided entry to and departure from the Republic of the Sudan for members of Al-Qaeda without normal customs inspections and payment of fees to which all other persons were subjected.

(Id. ¶¶ 26, 27, 29, 30.)

Sudan contends that these allegations are insufficient to establish jurisdiction under §

1605(a)(7).  Sudan's core contentions are that Plaintiffs failed to plead causation, failed to plead

that Sudan provided material support and resources with the requisite specificity, and failed to

plead that the employees, agents, or officials of the Sudanese government who allegedly provided

the material support and resources acted within the scope of their governmental position. Each

argument is addressed *in seriatim*.

2.    **'Caused By'**

a)    **Proximate Cause vs. 'But For' Cause**

There is no question that "causation is indeed a jurisdictional requirement" under §

1605(a)(7); the statute makes it a prerequisite to jurisdiction. Kilburn v. Socialist People's

Libyan Arab Jamahiriya, 376 F.3d 1123, 1127 (D.C. Cir. 2004). Sudan urges this Court to

interpret the "caused by" element as requiring a plaintiff to plead that a defendant's material

support of terrorism is the "but for" cause of the personal injury or death alleged. Such a rule

was rejected by the United States Court of Appeals for the District of Columbia Circuit ("D.C.

Circuit") in Kilburn, which emphasized that, "[a]s a moment's inspection of § 1605(a)(7) makes

clear, there is no textual warrant for this claim: the words 'but for' simply do not appear; only

'caused by' do." 376 F.3d at 1128 (citations omitted). Instead, the D.C. Circuit held that §

1605(a)(7) requires only a showing of "proximate cause" to establish jurisdiction. Id. This

conclusion was based on Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S.

527, 536-38 (1995), in which the United States Supreme Court held that the phrase "caused by"

in the Extension of Admiralty Jurisdiction Act, 46 U.S.C. app. § 740, refers to proximate cause.

The Supreme Court in Grubart explained that proximate cause is sufficient as a pleading

requirement under the Extension of Admiralty Jurisdiction Act because "this classic tort notion

normally eliminates the bizarre." Id. at 536. As the Supreme Court explained, and the Kilburn

16

court emphasized in the context of the terrorism exception, "[t]here is simply no need or justification for imposing an additional nonremoteness hurdle in the name of jurisdiction." Grubart, 513 U.S. at 538, quoted in Kilburn, 376 F.3d at 1128.  This Court agrees: the phrase "caused by" in § 1605(a)(7) refers to "proximate cause."

### b)       The Factual Allegations

Whether the facts alleged are sufficient to establish proximate cause as a matter of pleading is a question of law.  Proximate cause is "a cause-in-fact . . . treated by the law as sufficiently 'substantial' to warrant imposing liability upon the actor."  Farwell v. Un, 902 F.2d 282, 290 (4th Cir. 1990) (citing Restatement (Second) of Torts §§ 430-33; Prosser & Keeton on Torts § 41 (5th ed. 1984)).  In the context of pleading, proximate cause is satisfied when the facts contained in the complaint could, if proven, reasonably warrant holding the defendant liable.  Put differently, the proximate cause standard permits the reasonable, while prohibiting the bizarre.

Plaintiffs allege that "Al-Qaeda could not have existed or planned its acts of terrorism, including an act directed at an American Naval vessel, without the support of sponsors of terrorism including Defendant Republic of the Sudan."  (Am. Compl. ¶ 29, Doc. No. 10.)  In support, they allege manifold facts from which a fact-finder could reasonably conclude that Sudan should be held liable for the bombing of the Cole.  The allegations underpinning the alleged connection between the Cole bombing and Sudan's support to Al-Qaeda include claims that Sudan and Osama bin Ladin held joint holdings in a company and a bank, that Sudan permitted transport of explosives through diplomatic pouches, that Sudan allowed Al-Qaeda to run training camps for terrorists within its borders, and, perhaps most damaging, that Sudan allowed an Al-Qaeda operative to ship crates filled with explosives from Sudan to the site of the

Cole bombing.  These allegations, if true, would permit an that Sudan's conduct was the proximate cause of the Cole bombing and the deaths of the seventeen American sailors aboard. Such an inference is reasonable and anything but bizarre.  As a consequence, the facts pled are legally sufficient at the pleading stage.

Sudan argues that there is no "actual fact" that would support the conclusion that Sudan's conduct was the proximate cause of the Cole bombing.  (Def.'s Mem. in Supp. of Mot. at 12, Doc. No. 42.)  This could not be further from the case.  For example, if Plaintiffs manage to prove that Sudan permitted the transport of explosives to Yemen around the time of the Cole bombing, Sudan could reasonably be linked to the attack.  Likewise, if Plaintiffs managed to prove that the Al-Qaeda operatives who carried out the Cole bombing were trained in camps tacitly endorsed by Sudan, proximate cause could possibly be established.  Finally, if Plaintiffs can prove at the liability phase that Sudan's financial dealings with Osama bin Ladin and Al-Qaeda provided the organization with the resources and opportunity to carry out the attack, legal causation could be established.  See Kilburn, 376 F.3d at 1130 (holding, separately from the causation issue, that § 1605(a)(7) does not require a plaintiff to plead that a foreign state directly funded a specific terrorist act to proceed under the material support and resources clause because "[m]oney, after all, is fungible, and terrorist organizations can hardly be counted on to keep careful bookkeeping records").

Sudan argues to the contrary largely on the ground that the Complaint does not contain dates, times, and, in some instances, specific names or otherwise show a direct link between Sudan's conduct and the Cole bombing.  While a failure to prove temporal proximity between Sudan's conduct and the Cole bombing may ultimately prohibit a finding of liability, the failure

to plead specific dates and other such information at this point in the litigation, prior to the opening of discovery, and particularly when the allegations are otherwise specific and overwhelming, cannot suffice to invoke sovereign immunity at the pleading stage.

Congress' inclusion of the "caused by" requirement in the FSIA does not require a plaintiff to prove his claim at the pleading stage.  To hold otherwise would confuse a jurisdictional inquiry with a trial on the merits and undermine general pleading rules.  See Fed. R. Civ. P. 8(a).  Indeed, adopting Sudan's position would create a jurisdictional sinkhole that would swallow the substantive law of liability.  The D.C. Circuit recognized this:

> the only issue before us [at this stage] is *jurisdictional* causation, because § 1605(a)(7) is solely a jurisdictional provision. [citation omitted].  To succeed in the end, the plaintiff must go beyond jurisdiction and provide proof satisfying a substantive cause of action . . . . Any concerns about reaching too far to charge foreign states with the attenuated impact of their financial activities are better addressed as questions of substantive law.  Indeed, to go further as a matter of jurisdiction – to accept [Sudan's] contention that § 1605(a)(7) requires a single causation standard that is more restrictive than the base-line standard of proximate cause – runs afoul of th FSIA's injunction that a non-immune "foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 1606.

Kilburn, 376 F.3d at 1129; cf. Owens v. Republic of Sudan, 374 F. Supp.2d 1, 13-14 (D.D.C. 2005) (Bates, J.) ("It is noteworthy that the court in Kilburn emphasized that § 1605(a)(7) is only a jurisdictional framework, and that any lingering concerns that foreign states would be exposed to damages for remote or attenuated acts of support could be addressed through the substantive law of liability.")

As a matter of law, the factual allegations in the Complaint are sufficient to satisfy the "caused by" element of jurisdiction.

### 3.    'Material Support or Resources'

To satisfy this jurisdictional element, a plaintiff must plead that the foreign state provided material support or resources as defined by 18 U.S.C. § 2339A, which includes

> currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials.

18 U.S.C. § 2339A.  So, to overcome sovereign immunity, FSIA plaintiffs must plead conduct that, if proven, would fall within this definition; a conclusory allegation that the foreign state provided "material support or resources" to terrorists is insufficient.  Indeed, "in light of the serious and far-reaching implications of the [terrorist exception and related FSIA provisions], it is especially important for the courts to ensure that foreign states are not stripped of their sovereign immunity unless they have been charged with actual[ly providing material support or resources to an act of terrorism]."  Price, 294 F.3d at 93.

Sudan argues that Plaintiffs' allegations do not meet the legal definition of "material support or resources," contending that the alleged acts, even if true, are legally immaterial and that they are too conclusory to warrant waiving sovereign immunity.  This argument is difficult to countenance.  There is nothing legally immaterial or conclusory about the allegations in the Complaint.  Plaintiffs claim that Sudan provided "safe harbor and shelter" to Osama bin Ladin and Al-Qaeda (Am. Compl. ¶ 27, Doc. No. 10), that it permitted the use of the diplomatic pouch for the transportation of explosives, that it gave Al-Qaeda operatives "*special authority* to avoid paying taxes and duties," and that it "*allowed*" Al-Qaeda to operate terrorist training camps in Sudan, among other allegations.  (Id. ¶ 27.)  These all fall within the definition of material support or resources, as they involve the provision of lodging, transportation, safe houses,

explosives and facilities.  These examples do not even make mention of the allegations of financial commingling between Sudan and Osama bin Ladin and Al-Qaeda (Id.), which constitutes the giving of currency, monetary instruments, financial securities, or financial services, all of which fall within the statutory definition of "material support or resources."  In fact, these facts not only satisfy the definition of "material support or resources," but suggest the existence of a joint enterprise or partnership.  If these allegations do not suffice to establish "material support or resources" for the purpose of jurisdiction, it is difficult to imagine what can.

Sudan relies heavily on the recent result in Owens, where the United States District Court for the District of Columbia Circuit ("D.C. District") concluded that allegations of "'cover', 'support', and 'sanctuary'," along with "a single allegation that a meeting occurred in the Republic of Sudan between the leaders of al Qaeda and Hizbollah to plan embassy attacks" were too conclusory to establish jurisdiction.  374 F. Supp.2d at 12.  As explained, the Complaint in this case goes well beyond such curt allegations, claiming that specific business relationships between Sudan and Osama bin Ladin and Al-Qaeda existed, that transportation of explosive devices, including to the place where the USS Cole was bombed, was either endorsed or permitted, and that Sudan allowed terrorist training to take place within its borders.  (Am. Compl. ¶ 27, Doc. No. 10.)  A greater degree of specificity may be required to entitle Plaintiffs to relief, but not to entitle them to jurisdiction.  Again, to require more would subsume the law of liability into the law of jurisdiction.

Defendants also rely on two recent D.C. Circuit cases, which concluded that factual allegations of torture and hostage taking were insufficient to establish jurisdiction under § 1605(a)(7).  First, in Price, the D.C. Circuit held that mere allegations of "kicking, clubbing, and

beatings" are insufficient to invoke the "torture clause" of the FSIA terrorist exception.  294 F.3d at 93.  In support, the Price court emphasized that the legal definition of torture involves not only the conduct involved, but also requires a measuring of the severity of the conduct and the purpose of the conduct.  See id. at 92-94.  As a consequence, bald allegations of kicking, clubbing, and beatings, without more, provide no information from which a court can discern, at the pleading stage, whether the conduct alleged actually constitutes torture.  "In short, there is no way to discern whether plaintiffs' complaint merely alleges police brutality that falls short of torture."  Id. at 93-94.

Similarly, in Simpson v. Socialist People's Libyan Arab Jamahiriya, 326 F.3d 230 (D.C. Cir. 2003), the D.C. Circuit concluded that allegations by a plaintiff that she was "held captive and incommunicado for several months" do not, in and of themselves, satisfy the requirements of the "hostage taking clause" of the FSIA terrorist exception because being held captive and incommunicado does not fall within the definition of "hostage taking."  Id. at 235.  "'Hostage taking' occurs under [FSIA] when a person seizes or detains and threatens to kill, to injure or to continue to detain another person *in order to compel a third party* . . . to do or abstain from doing any act as an explicit or implicit condition for the release of a hostage."  Id. at 234 (internal quotation marks omitted) (emphasis added).  The complaint in Simpson was insufficient because it did not allege that the purpose of the plaintiff's being taken captive was "in order to compel a third party" to do anything at all.[13]

In contrast, the definition of "material support or resources" requires no evaluation of

_____

[13]It is worth noting that ultimate remedy for the pleading insufficiencies in Price, Simpson, and Owens was to grant the plaintiffs leave to amend.

degree or even of purpose.  Section 2339A of Title 18 proscribes specific conduct, not conduct to

a specific extent or for a specific purpose.  In any event, to the extent that either degree or

purpose is an issue with respect to the provision of material support or resources, both are

covered by the proximate cause pleading requirement.  As explained above, the allegations pled

in the Complaint, if true, more than suffice to satisfy the jurisdictional element for proximate

cause.  Likewise, they more than suffice to satisfy the jurisdictional element of providing

material support and resources.  As a matter of law, the factual allegations in the Complaint are

sufficient to satisfy the "material support or resources" element of jurisdiction.

### 4.   'Within the Scope'

Finally, Sudan contends that the Plaintiffs' Complaint does not sufficiently allege that

officials, employees, or agents of the Sudanese government who committed the acts alleged acted

within the scope of their governmental position.  To the contrary, the Complaint does so allege.

As an initial matter, the Complaint summarily alleges that "[t]he provision of material

support or resources was engaged in by officials, employees and agents of the Republic of Sudan

while such officials, employees or agents were acting within the scope of their office,

employment or agency."  (Am. Compl. ¶ 26, Doc. No. 10.)  The facts alleged in the subsequent

paragraphs of the Complaint support that assertion.  Activities such as permitting the use of

diplomatic pouches to transport explosives, waiving payment of taxes and duties, allowing the

formation of terrorist training camps, and establishing a company and bank with Osama bin

Ladin could reasonably have been done within the scope of a government duty.  In fact, these are

allowances that only individuals in the highest echelons of government can make.  In the United

States, for instance, even a Federal Judge or a single member of the Congress cannot provide

diplomatic pouches or waive taxes and duties.  These are acts that can only be taken within the scope of a specific government role and, more likely than not, by an upper-level member of the government accorded significant discretion; only the duly designated representative of a government may utilize diplomatic privileges and pouches.  It is accordingly reasonable to infer, assuming the truth of the facts pled, that the material support and resources alleged were provided by government officials acting within the scope of their duties.  As a matter of law, the factual allegations in the Complaint are sufficient to satisfy the "within the scope" element of jurisdiction.

### D.     Conclusion

At the core of Sudan's subject matter jurisdiction challenge is the contention that the factual allegations in the Complaint, even if true, and even permitting all reasonable inferences, would not prove a direct link between Sudan, Al-Qaeda, and the bombing of the USS Cole. Absent proof of a direct link, so goes the argument, there is no causal connection and any support given must have been de facto immaterial.  However, imposing a requirement at the pleading stage that a plaintiff allege, with exacting specificity, a direct link between a foreign state and a terrorist organization, be it under the jurisdictional element of proximate cause or material support, would undercut the jurisdiction that § 1605(a)(7) confers.  The essence of state sponsorship of terrorism is that the foreign state is not the direct actor.  State sponsors of terrorism *sponsor, foster* and *promote* terrorism, they do not carry the acts out themselves. Requiring a plaintiff to plead and/or demonstrate a direct link at this stage in a case would render the FSIA terrorist exception meaningless.  In any event, the facts alleged here, assuming their truth, evince a partnership that, at the pleading stage, constitute a direct link between Sudan and

Al-Qaeda or evince an agency relationship similar to that which diplomats enjoy.

Moreover, it is not as if Sudan is not accorded sufficient protection under the terrorist exception to the FSIA. As explained above, there are two manners in which to challenge a courts' subject matter jurisdiction in a FSIA case: by challenging the legal sufficiency of the allegations as pled, as was the case here, or, alternatively, challenging the actual sufficiency of the jurisdictional evidence. See supra Part II.A. and note 6. Had Sudan selected the former, limited jurisdictional discovery would have been ordered and Plaintiffs would have faced a heightened jurisdictional burden. Sudan did not choose that course.

As a matter of law, the factual allegations in the Complaint are sufficient to satisfy the requisite elements of jurisdiction under the FSIA terrorism exception and the material support and resources clause in particular. Accordingly, the Motion to Dismiss for want of jurisdiction over the subject matter is **DENIED**.

## III.     PERSONAL JURISDICTION AND SERVICE OF PROCESS

In its memorandum in support of its June 17, 2005 Motion to Vacate Default (Doc. No. 30), Sudan argued that this Court lacks jurisdiction *in personam* on the grounds that process and service of process were defective. This contention was not raised in Sudan's original moving papers to vacate default. (Doc. No. 29.) This Court consequently concluded that Sudan waived personal jurisdiction by filing its Motion to Vacate Default without asserting any personal pleas. (Minute Order of June 30, 2005, Doc. No. 35; supra note 1; supra Part I.B.) Nevertheless, at the June 30, 2005 hearing on Sudan's Motion to Vacate Default, this Court addressed the merits of Sudan's contention that process was deficient, finding that process complied with the

requirements of the FSIA, Rule 4 of the Federal Rules of Civil Procedure, and Virginia law.  (<u>See</u> <u>id.</u>)  Parts III.A and B of this Memorandum Opinion and Order memorializes the reasons for this Court's decisions of June 30, 2005.

Even though this Court conclusively resolved the personal jurisdiction plea at the June 30, 2005 hearing, Sudan has reasserted it and, this time, leveled a new argument: Sudan now contends that exercising personal jurisdiction would violate the Due Process Clause of the Fifth Amendment to the United States Constitution because it lacks sufficient minimum contacts with the forum state.  Since Sudan already waived personal jurisdiction, this argument is moot. However, even if it is ultimately determined on appeal that Sudan did not waive personal jurisdiction by filing its June 30, 2005 Motion to Vacate Default without setting forth in the Motion such a plea, Sudan is estopped from raising the minimum contacts argument by virtue of the fact that it subsequently raised a personal jurisdiction plea on other grounds, the merits of which have been settled.  Sudan lost the benefit of a Due Process defense by failing to raise it along with its process and service of process arguments in its memorandum supporting the Motion to Vacate Default.  Nonetheless, even if Sudan properly asserted its minimum contacts defense, personal jurisdiction still obtains because the Due Process Clause does not apply to foreign states and fundamental fairness and substantial justice are not undermined by haling Sudan to the Eastern District of Virginia to defend this case.  The reasoning for this is explained in Part III.C.

### A.    Waiver

"Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived."  <u>Insurance Corp. of Ireland, Ltd. v. Compagnie</u>

des Bauxites de Guinee, 456 U.S. 694, 703 (1982).  A personal jurisdiction plea not raised by a

preliminary Rule 12 motion or asserted in a party's first responsive pleading is forever waived.

Fed. R. Civ. P. 12(h)(1).  Indeed, time is of the essence when it comes to personal defenses such

as want of jurisdiction *in personam*.  See infra Part IV.A.  The issue of personal jurisdiction must

be raised seasonably, for it "is indubitably waived absent timely objection."  Porsche Cars North

America, Inc. v. Porsche.Net, 302 F.3d 248, 257 (4th Cir. 2002); see also Brickwood

Contractors, Inc. v. Datanet Engineering, Inc., 369 F.3d 385, 394 (4th Cir. 2004) ("Unlike subject

matter jurisdiction, the requirement of personal jurisdiction may be waived. . . . Thus, even if the

district court in fact lacked personal jurisdiction over a party, the failure to timely raise the

defense may result in the enforcement of a judgment that the district court was, in one sense,

powerless to render."); Foster v. Arletty 3 Sarl, 278 F.3d 409, 413 (4th Cir. 2002) ("[A]

defendant may consent to a court's exercise of jurisdiction either implicitly or explicitly, and '[a]

variety of legal arrangements have been taken to represent' this consent.  Insurance Corp. of

Ireland, 456 U.S. at 703.").  Accordingly, a defendant must "exercise great diligence in

challenging personal jurisdiction . . . or service of process."  5 Charles Alan Wright and Arthur

R. Miller, Federal Practice and Procedure § 1391 (3d ed. 2004) ("Wright & Miller").

The Republic of Sudan did not exercise great diligence in challenging personal

jurisdiction in this case.  On June 17, 2005, Sudan entered its first appearance after having been

in default since February of that year and since having been on notice of the suit since December

16, 2004.  See supra Part I.B.  Based on the language contained in the Motion to Vacate Default,

the purpose of Sudan's appearance was to vacate default and cancel the evidentiary hearing

scheduled for August 23, 2005 so that it could defend the lawsuit, not to assert a personal

27

jurisdiction defense.  Indeed, the Motion was styled as a "Motion to Vacate Entry of Default and

Cancel Evidentiary Hearing" and asked "for an Order vacating the Entry of Default and

Canceling the Evidentiary Hearing currently set for August 23, 2005 . . . ," and *nothing else*.

(Doc. No. 29.)  Accompanying the Motion to Vacate Default was a memorandum of law in

support.  (Doc. No. 30.)  The memorandum of law, unlike the moving paper, alleged that "the

Court lacks personal jurisdiction over Sudan because Plaintiffs have not effected service of

process on Sudan in accordance with [28] U.S.C. § 1608(a)."  (Id. at 3.)  At no time did Sudan

actually *move* the Court for dismissal on the ground of personal jurisdiction.  By failing to do so,

Sudan implicitly waived personal jurisdiction.  Moreover, a memorandum of law is not in any

sense a motion.

　　　At the June 30, 2005 hearing on the Motion to Vacate Default, Sudan urged the Court to

incorporate its personal jurisdiction plea into the Motion to Vacate Default because the Motion

made reference to the memorandum of law.  (Tr. of Hrg. at 13-14, Doc. No. 36.)  Refusing to do

so, Sudan argued, "would be a colossal triumph of form over substance."  (Id.)  The fact is,

however, that form matters when it comes to the assertion of personal defenses.  If form did not

matter, the Federal Rules of Civil Procedure would not impose a requirement that personal

jurisdiction defenses be pled in a preliminary motion or in the party's first responsive pleading.

In addition, the distinction between a moving paper and a memorandum of law is not one to be

taken lightly.  A moving paper makes a specific *request for relief* of some sort from a court.  A

memorandum of law in support, on the other hand, supplies the *reasons* why the moving party is

entitled to that relief.  See E.D. Va. Local R. Civ. P. 7(A) and 7(F) (setting forth the distinct

requirements of motions and memoranda of law and requiring a separate memorandum to be

submitted with all motions filed).  If moving papers are permitted to incorporate additional

requests for relief stated in associated memoranda, there would be no purpose for requiring a

separate moving paper in the first place.  A memorandum of law supports a matter.  It does not,

and cannot be permitted to, control a matter.  (See Tr. of Hrg. at 14, Doc. No. 36.)  Otherwise,

the tail wags the dog.

Moving to vacate default is a request for permission to defend a suit; objecting to

personal jurisdiction is a request to be freed from the burdens of suit.  By moving to vacate

default, without also moving to dismiss for want of personal jurisdiction, Sudan asked, first and

foremost, to come aboard the litigation so that it could mount a defense on the merits.  This

constitutes a general appearance.  Upon making a general appearance, the defense of jurisdiction

over the person is forever waived.  Sudan's failure to raise the issue of personal jurisdiction in its

moving paper may have been inadvertent, but the law of personal defenses assigns consequences

for such inadvertence.  Personal privileges simply must be raised at the outset of a party's entry

into a case.  Accordingly, Sudan waived the defense of lack of jurisdiction *in personam*.

### B.    Personal Jurisdiction: Service of Process

Sudan's original personal jurisdiction plea, asserted in the memorandum of law

accompanying its Motion to Vacate Default, alleged that personal jurisdiction does not exist

because service of process did not comply with the requirements of the FSIA.  Even if Sudan had

not waived personal jurisdiction through its general appearance to vacate default, this Court still

has personal jurisdiction by virtue of the fact that process was served effectively.

### 1.    The Statutory Framework

Just as with subject matter jurisdiction, the FSIA is the sole source of personal

jurisdiction over a foreign state.[14]  See Amerada Hess, 488 U.S. at 435 n.3.  According to

subsection (b) of 28 U.S.C. § 1330, "[p]ersonal jurisdiction over a foreign state shall exist as to

every claim for relief over which the district courts have jurisdiction under subsection (a) where

service has been made under section 1608 of this title."  Accordingly, a federal district court may

exercise personal jurisdiction over a foreign state if, and only if, 1) process and service of process

comply with the requirements of § 1608 of the FSIA, and 2) the foreign state is not entitled to

sovereign immunity under §§ 1605-07.  See Unidyne Corp. v. Aerolineas Argentinas, 590 F.

Supp. 391, 394 (E.D. Va. 1984) (Doumar, J.) ("Unidyne I") ("The [FSIA] makes the statutory

prerequisite for personal jurisdiction a two-step process: subject matter jurisdiction plus proper

service of process equals personal jurisdiction."); see also Amerada Hess, 488 U.S. at 435 n.3

("Thus, personal jurisdiction, like subject-matter jurisdiction, exists only when one of the

exceptions to foreign sovereign immunity in §§ 1605-1607 applies."); Verlinden B.V. v. Central

Bank of Nigeria, 461 U.S. 480, 489 n.14 (1983) (same); Unidyne Corp. v. Aerolineas Argentinas,

590 F. Supp. 398, 399 (E.D. Va. 1984) (Doumar, J.) ("Unidyne II") ("*In personam* jurisdiction is

established only if proper service is effected under 28 U.S.C. § 1608.").  Since the Court has

already determined that the terrorist exception to foreign sovereign immunity applies to this case,

see supra Part II, the only question remaining with respect to personal jurisdiction is whether

service of process was proper.

---

[14]The FSIA is the sole source of personal jurisdiction over a foreign state because the
protections of Due Process are not extended to foreign states.  See infra Part III.C.  Even Sudan
endorsed this view in its memorandum in support of its Motion to Vacate Default, arguing that
"[t]he FSIA is the sole basis for obtaining subject matter *or personal jurisdiction* of a U.S. court
over a foreign sovereign."  (at 3, Doc. No. 30; emphasis added.)  Having expressed this view to
the Court, Sudan's unseasonable minimum contacts argument is all the more incredible.

According to the FSIA,

(a) Service in the courts of the United States and of the States shall be made upon a foreign state or political subdivision of a foreign state:

> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or

> (2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or

> (3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign site, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned; or

> (4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services – and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a).  These procedures are the exclusive means of serving process on a foreign state.  Unidyne II, 590 F. Supp. at 401; see also Transaero, Inc. v. La Fuerza Aerea Boliviana, 30 F.3d 148, 154 (D.C. Cir. 1994) ("We hold that strict adherence to the terms of § 1608(a) is required."); Fed. R. Civ. P. 4(j)(1) ("Service upon a foreign state . . . shall be effected pursuant to 28 U.S.C. § 1608.").  The means for serving process are hierarchical in application.  A plaintiff must thus attempt to utilize the method prescribed by subsection (3) before resorting to the method prescribed by subsection (4).  Unidyne II, 590 F. Supp. at 401.

2.      **Discussion and Analysis**

The parties agree that service of process under either subsection (1) or (2) was

unavailable to Plaintiffs.  Accordingly, they proceeded to serve process under subsection (3),

which requires that process "be addressed and dispatched by the clerk of the court to the head of

the ministry of foreign affairs of the foreign state concerned."  28 U.S.C. § 1608(a)(3).  It is

undisputed that Plaintiffs' process papers were addressed to the Minister of Foreign Affairs and

returned executed by certified mail to the Sudanese Embassy in Washington, D.C. for delivery to

the Minister of Foreign Affairs in Sudan via diplomatic pouch.  (See Doc. Nos. 8, 9, 12, 13.)  In

addition to utilizing the procedure in subsection (3), it is also undisputed that Plaintiffs

subsequently served process via the United States Secretary of State pursuant to subsection (4).[15]

(See Doc. Nos. 17, 31.)

Defendant contends that service was improper under subsection (3) because, though the

process papers were addressed to Sudan's "Minister of Foreign Affairs," they were delivered to

the Sudanese Embassy in the United States.[16]  Sudan alleges that subsection (3) requires that

process be delivered directly to the Minister of Foreign Affairs in Sudan, as opposed to

delivering it to him via that country's embassy.  Delivery by a diplomatic bag, Sudan alleges, is

---

[15]Sudan contends that the procedures set forth in subsection (4) were not available to
Plaintiffs because they did not comply with the requirements of subsection (3).  This argument is
moot, as Plaintiffs service of process did in fact comply with subsection (3).

[16]By sheer virtue of Sudan's appearance to vacate default, there is no question that Sudan
was accorded actual notice of this suit.  Though the FSIA provides the exclusive means of
serving process on a foreign state, since Plaintiffs allege causes of action arising under Virginia
law, see infra Part I.A, and further since they have haled Sudan to a federal court in Virginia, it is
noteworthy that Virginia permits actual notice to cure other service defects.  See Va. Code §
8.01-288.

forbidden.  As Sudan argues in its brief, "[t]he U.S. Postal Service provides registered mail with

return receipt to Khartoum, Sudan, and private companies such as DHL offer deliveries to Sudan

with signed receipts."  (Def.'s Memo. in Supp. of Mot. to Vacate Default at 10, Doc. No. 30.)

However, this argument ignores the inherent reliability and security associated with diplomatic

pouches.  The diplomatic bag, unlike the United States Postal Service, DHL, or any other

commercial carrier, is accorded heightened protection under international law to ensure safe and

uncompromised delivery of documents between countries and among duly qualified government

officials.  <u>See</u> Vienna Convention on Diplomatic Relations, arts. 27 & 40, 23 U.S.T. 3227,

T.I.A.S. No. 7502, 500 U.N.T.S. 95.  Surely the legislature did not intend to designate the United

States Postal Service or a commercial carrier as the preferred method of delivery to the Minister

of Foreign Affairs.  The text of § 1608(a)(3) does not prohibit service on the Minister of Foreign

Affairs at an embassy address.  Indeed, the statute does not prescribe the place of service, only

the person to whom process must be served.  Sudan does not cite a single case in support of its

position.  To the contrary, the caselaw it cites involve instances where service was directed to a

*person* other than the Minister of Foreign Affairs, not to a *place* other than the Ministry of

Foreign Affairs.  <u>See, e.g.</u>, <u>Magness v. Russian Fed'n</u>, 227 F.3d 609, 613 (5th Cir. 2001)

(directing service to the president of the Russian Federation); <u>Transaero</u>, 30 F.3d at 153

(directing service to an ambassador).[17]  Accordingly, Sudan's objection to the sufficiency of

---

[17]In the present Motion to Dismiss, in addition to reasserting its challenge to service of process, Sudan also challenges the sufficiency of process.  However, Sudan presents no reason why process itself was insufficient in either its memorandum of law in support of its Motion to Vacate Default (Doc. No. 30), or in its memorandum of law in support of this Motion.  (Doc. No. 42.)  Accordingly, Sudan's unsupported allegation that process was not legally sufficient is without merit.

process and service of process is overruled.

### C.      Personal Jurisdiction: Minimum Contacts

Pursuant to the analysis above, supra Part III.A and B, Sudan is subject to personal

jurisdiction under the terms of the FSIA.  Even so, a statute cannot confer personal jurisdiction

where the Constitution forbids it.  Price, 294 F.3d at 297.  Sudan alleges that the Due Process

Clause of the Fifth Amendment does not permit the exercise of personal jurisdiction by this

Court because Sudan lacks sufficient minimum contacts with the forum.  See Int'l Shoe Co. v.

Washington, 326 U.S. 310, 316 (1945).  This argument fails on three accounts.  First, Sudan is

estopped from raising this ground by virtue of the fact that it did not raise it along with its

challenge to the sufficiency of service of process, even though that challenge was itself untimely.

Second, the Due Process Clause does not apply to foreign states.  Finally, even if it did, haling

Sudan to the Eastern District of Virginia to defend this lawsuit does not offend traditional notions

of fair play and substantial justice, which undergird Due Process.

### 1.      Estoppel

"[W]hen a defendant appears and challenges jurisdiction, it agrees to be bound by the

court's determination on the jurisdictional issue."  Transaero, Inc. v. La Fuerza Aerea Boliviana,

162 F.3d 724, 729 (2d Cir. 1998), cited in Foster, 278 F.3d at 413.  Accordingly, a defendant that

raises a personal jurisdiction plea, timely or not, is estopped from reasserting it under the guise of

a new legal argument.  See Insurance Corp. of Ireland, 456 U.S. at 704 ("[F]or various reasons a

defendant may be estopped from raising the issue [of personal jurisdiction].");  see also Index

Fund, Inc. v. Hagopian, 107 F.R.D. 95, 101 (S.D.N.Y. 1985) ("As explained in the Advisory

Committee's Notes on Rule 12(h)(1)(A), . . . 'specified defenses which were available to a party

when he made a preanswer motion, but which he omitted from the motion, are waived.'").

In its memorandum of law in support of its Motion to Vacate Default, Sudan objected to the personal jurisdiction of this Court by challenging the sufficiency of process and service of process, despite not raising the matter of personal jurisdiction in its actual moving paper. Though that plea was untimely in and of itself, which resulted in an implicit waiver of personal jurisdiction, the Court nonetheless addressed the merits of Sudan's arguments. See supra Part III.B. Assuming for the sake of argument that the memorandum of law raised a proper challenge to the Court's personal jurisdiction, Sudan bound itself to the Court's resolution of the issue. The Court conclusively resolved the personal jurisdiction plea at the June 30, 2005 hearing on Sudan's Motion to Vacate Default (Tr. of Hrg. at 30, Doc. No. 36), the reasons for which are memorialized above in Part III.B. Sudan is therefore estopped from raising another personal jurisdiction plea under new auspices.

### 2.    Minimum Contacts

Even if Sudan was not estopped from asserting a new legal argument in opposition to personal jurisdiction, its Due Process challenge would fail because a foreign state is not a "person" for purposes of the Fifth Amendment to the Constitution. The Due Process Clause requires that a defendant "not present within the territory of the forum . . . have certain minimum contacts with it such that the maintenance of the suit does offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe, 326 U.S. at 316 (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)). Only "persons" are afforded this protection. See U.S. Const. amend. V ("No *person* shall . . . be deprived of life, liberty, or property, without due process of law . . . ." (emphasis added)). Many courts, including this one, have proceeded as if a foreign state is a

"person" for purposes of evaluating jurisdiction.  See, e.g., Unidyne Corp. v. Aerolineas

Argentinas, 640 F. Supp. 354, 360 (E.D. Va. 1985) (Doumar, J.) ("Unidyne III") ("An FSIA

defendant is entitled to the same constitutional protections in this Court as an out-of-state

corporation . . . or other alien corporations . . . ."); see also Price, 294 F.3d at 96 (collecting

examples).  However, since this Court's holding in Unidyne III, the United States Supreme Court

has indicated that the question whether a foreign state is a person for purposes of Due Process

remains open.  See Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 619 (1992)

("Assuming, without deciding, that a foreign state is a 'person' for purposes of the Due Process

Clause . . .").  Indeed, it is apparent that the assumption that a foreign state is a person is merely

an unchallenged assumption.

      Only the D.C. Circuit has addressed the question whether a foreign state is a "person" for

purposes of Due Process head on.  It held that a foreign state is not a person, primarily on the

ground that

> it would be highly incongruous to afford greater Fifth Amendment rights to foreign
> nations, who are entirely alien to our constitutional system, than are afforded to the states,
> who help make up the very fabric fo that system. . . . Given this fundamental dichotomy
> between the constitutional status of foreign states and States within the United States, we
> cannot perceive why the former should be permitted to avail themselves of the
> fundamental safeguards of the Due Process Clause if the latter may not.

Price, 294 F.3d at 96-7.  Further underpinning the "fundamental dichotomy" between the status

of foreign states and States of the United States is the fact that the Constitution imposes no limits

on the powers of foreign states, whereas it imposes manifold limits on the powers of the States:

> [T]he Constitution does not limit foreign states, as it does the States of the Union, in the
> power they can exert against the United States or its government.  Indeed, the federal
> government cannot invoke the Constitution, save possibly to declare war, to prevent a
> foreign nation from taking action adverse to the interest of the United States or to compel

> it to take action favorable to the United States.  It would therefore be quite strange to interpret the Due Process Clause as conferring upon [a foreign state with] rights and protections *against* the power of federal government.

Id. at 97 (emphasis in original).  This Court agrees: to afford foreign states rights and protections against the United States Government that are not similarly extended to the States of the Union, would result in an irony not countenanced by the Constitution.

Congress appears to have recognized this when it enacted the FSIA.  Unlike most statutes, the FSIA contains a specific provision for personal jurisdiction, conditioning it on effective service of process and the existence of subject matter jurisdiction.  Ordinarily, statutes do not contain requirements for personal jurisdiction.  The reason is obvious: the sole source for personal jurisdiction over a person is the Constitution.  A statute may not provide for personal jurisdiction where the Constitution forbids it.  By providing for personal jurisdiction in the FSIA, Congress implicitly endorsed the view that the Constitution does not limit a court's jurisdiction *in personam* over foreign states.  Cf. Amerada Hess, 488 U.S. at 435 n.3 ("Personal jurisdiction . . . exists only when one of the exceptions to foreign sovereign immunity in §§ 1605-1607 applies.  [citation omitted].  Congress' intention to enact a comprehensive statutory scheme is also supported by the inclusion in the FSIA of provisions for venue, 28 U.S.C. § 1391(f), removal, § 1441(d), and attachment and execution, §§ 1609-1611.").  In fact, the minimum jurisdictional contacts and adequate notice requirements of Due Process are implicit in the FSIA's provisions for personal jurisdiction.  See H.R.Rep. No. 1487, 94th Cong. 2d Sess., reprinted in 1976 U.S.Code Cong. & Admin.News 6604.  Had Congress believed that a foreign state was afforded Due Process protection, it would not have enacted the FSIA's exacting personal jurisdiction requirements in the first place.

Sudan cites three cases in support of its position that a foreign state is a person for purposes of Due Process.  See Altman v. Republic of Austria, 317 F.3d 954, 970 (9th Cir. 2002) (involving the FSIA expropriation exception); S & Davis Int'l, Inc. V. Yemen, 218 F.3d 1292, 1303-04 (11th Cir. 2000) (involving the FSIA commercial exception); Hanil Bank v. PT. Bank Negara Indonesia, 148 F.3d 127, 134 (2d Cir. 1998) (same).  Each of these cases was decided after Weltover.  Accordingly, like the Supreme Court, the courts in each case assumed, but did not decide, that a foreign state is a person for purposes of Due Process because, in each instance, the defendant had sufficient minimum contacts with the forum to warrant exercising personal jurisdictional.  Moreover, none of these cases involved the terrorist exception to the FSIA, which presents a fundamentally different paradigm than any of the other exceptions to foreign sovereign immunity.  It will almost never be the case that an alleged state sponsor of terrorism will have the type of minimum contacts with the forum that a state engaged in expropriating property, commercial enterprises, or other activities, private or public, will have.  State sponsors of terrorism do not enter into contracts in, conduct business in, negotiate deals in, or travel regularly to the States within the United States.  While there is no question that the minimum contacts test is the lodestar of Due Process under International Shoe, it could hardly be said that haling a foreign state listed on the United States Department of State's state sponsors of terrorism list, which is accused of providing material support and resources to operatives of Al-Qaeda who targeted American sailors when they bombed the USS Cole, into an American court undermines traditional notions of fair play and substantial justice.  This is not a case concerning commercial enterprises or similar private acts.  Applying the minimum contacts test as developed in the context of expropriation, commercial activities, or garden variety torts would prohibit nearly

every case brought under the terrorism exception to the FSIA.  That is a result that the FSIA does

not contemplate, and which the United States Constitution does not require.

 For all the above reasons, Sudan's personal jurisdiction plea alleging insufficient process

and service of process, as well as a lack of minimum contacts with the forum state, is **DENIED**.


**IV.**   **VENUE**

 The Republic of Sudan contends that the Eastern District of Virginia, Norfolk Division, is

an improper venue and requests dismissal or, in the alternative, transfer to the United States

District Court for the District of Columbia.  Sudan's objection to venue is overruled.  As with

personal jurisdiction, Sudan waived its objection to venue by not raising it in its first responsive

pleading and by virtue of the fact that it defaulted.  In any event, even if Sudan had not waived its

exception to venue, the objection is without merit.

 **A.**   **Waiver**

 A plea of improper venue must be raised in a preliminary Rule 12 motion or included in a

defendant's first responsive pleading or it is waived.  Fed. R. Civ. P. 12(h)(1)(A).  Indeed, "[a]

defendant, properly served with process by a court having subject matter jurisdiction, waives

venue by failing seasonably to assert it, or even simply by making default." Hoffman v. Blaski,

363 U.S. 335, 343 (1960) (citing Commercial Casualty Ins. Co. v. Consolidated Stone Co., 278

U.S. 177, 179 (1929)); see also 15 Wright & Miller § 3829.

 In this case, the Republic of Sudan did not take exception to venue until the present

Motion to Dismiss.  Prior to bringing this Motion to Dismiss, Sudan filed its Motion to Vacate

Default.  As explained above, Sudan's Motion to Vacate Default, in and of itself, constituted a

general appearance whereby it waived those personal privileges not included in that Motion. Sudan is of the position that its memorandum supporting its Motion to Vacate Default, which asserted a personal jurisdiction plea not included in its moving papers, should be incorporated by reference into its Motion to Vacate Default.  This Court rejected that position.  See supra Part III A.  However, even if it were the case that Sudan's memorandum of law and the personal jurisdiction plea it asserted therein was part and parcel of its general appearance to vacate default, and therefore was not waived, Sudan did not raise a plea of improper venue until *this* Motion to Dismiss.  The present Motion to Dismiss is the *first* instance in which the matter of venue has been raised.

Not only did Sudan not raise its venue objection until *after* filing its Motion to Vacate Default, *after* filing a memorandum of law containing an unseasonable and insufficient personal jurisdiction plea, and *after* appearing in Court to argue in favor of vacating default, Sudan took the additional steps of proposing a scheduling order for the subject matter jurisdiction inquiry and taking part in a telephonic status conference to discuss the scope of its subject matter jurisdiction challenge and other scheduling matters.  See supra Part I.B.  Those additional steps were not taken under objection.  Having indisputably failed to raise a venue objection in its first defensive move, and then participating in this litigation as though it believed venue was proper in the first place, Sudan forever waived its venue objection.  See Hagopian, 107 F.R.D. at 101-02 (emphasizing the care a defendant must take to ensure that personal defenses are raised in the first defensive move).  What is more, any objection to venue was also waived by virtue of Sudan's default, especially given that it waited until more than six months after being served with process to appear and defend.  See Hoffman, 363 U.S. at 343.

### B.    Statutory Requirements

Even if Sudan did not waive venue, the Eastern District of Virginia, Norfolk Division is a proper venue for this suit.  Federal statute prescribes four possible venues in cases involving a foreign sovereign brought pursuant to the FSIA:

1)    in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated;

2)    in any judicial district in which the vessel or cargo of a foreign state is situated, if the claim is asserted under section 1605(b) of this title;

3)    in any judicial district in which the agency or instrumentality is licensed to do business or is doing business, if the action is brought against an agency or instrumentality of a foreign state as define din section 1603(b) of this title; or

4)    in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof.

28 U.S.C. § 1391(f).  Sudan argues that none of the first three possibilities for venue prevail in this case and accordingly request that the matter be dismissed or transferred to the United States District Court for the District of Columbia pursuant to subsection (4).  See also 28 U.S.C. § 1404(a).  To the contrary, venue is proper pursuant to subsection (1).

Plaintiffs' Complaint does not specifically allege that venue is proper under any of the possible venues demarcated by § 1391(f).  Rather, in the "Jurisdiction and Venue" allegation, the Complaint merely alleges that

[a]t the time of the incident complained of herein, the location of the principal place of residence of [several of the] Plaintiffs . . . is within the Eastern District of Virginia.  Each of Plaintiffs' decedents was immediately prior to their death stationed aboard the U.S.S. Cole permanently stationed in the harbor in Norfolk, Virginia, located within the Eastern District of Virginia.

(Am. Compl. ¶ 1, Doc. No. 10.)  Since this action does not arise under § 1605(b) or § 1603(b) of

41

the FSIA, the only candidate for venue other than the District Court for the District of Columbia is subsection (1), which permits a case to be brought against a foreign sovereign "in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated."  At first blush, it appears that there is no judicial district in which a substantial part of the events giving rise to the claim occurred; because the bombing of the USS Cole took place in Yemen, it would appear that the facts giving rise to the cause of action arose there, and not in the Eastern District of Virginia. In fact, that is not the case.

Norfolk, Virginia is an appropriate venue because the decedent sailors were stationed in the Eastern District of Virginia in Norfolk, the USS Cole was home ported in Norfolk,[18] and several of the Plaintiffs are citizens of the Commonwealth who reside in Norfolk.  Indeed, a substantial portion of the events giving rise to this cause of action actually did occur in Norfolk, Virginia.  Under general admiralty law, a tort committed at sea "is deemed to occur[] not where the wrongful act or omission has its inception, but where the impact of the act or omission produces such injury as to give rise to a cause of action."  Wilson v. Transocean Airlines, 121 F. Supp. 85, 92 (N.D. Cal. 1954).  As the bombing of the Cole took place in extraterritorial waters, general principles of admiralty supply a basis for ascertaining where the cause of action arose. Moreover, though the damages alleged were caused by an act in a port in Aden, Yemen, the Plaintiffs' alleged loss of solatium or consortium, loss of love, affection, companionship, advice, and comfort as a consequence of wrongful death (Am. Compl. ¶ 32, Doc. No. 10), and loss of

---

[18]In admiralty cases, a vessel may be considered as constructively part of the territory or state in which it was docked.  See Wilson v. Transocean Airlines, 121 F. Supp. 85, 88 (N.D. Cal. 1954).

support due to the loss of earnings and earning capacity (Proposed Am. to Supp. Am. Compl. at 2, Pt. II, Doc. No. 28.), occurred in the place of residence of the Plaintiffs, not in the place of death of the sailors aboard the Cole.  For example, the alleged intentional infliction of emotional distress off the Plaintiffs could only occur where they are.  Since several of the Plaintiffs reside in the Eastern District of Virginia, and this is where their injuries arose, the cause of action can be said to have arisen here.  Consequently, this is a proper venue under subsection (1) of § 1391(f).

In addition, as a general rule, "[a]ctions for personal injury or death are transitory and may be brought in any court having jurisdiction over the parties and the subject matter of the case."  Pratt v. Kelly, 585 F.2d 692, 695 (4th Cir. 1978); see also Dennick v. Central R. Co. of New Jersey, 103 U.S. 11, 18 (1880) ("Wherever, by either the common law or the statute law of a State, a right of action has become fixed and a legal liability incurred, that liability may be enforced and the right of action pursued in any court which has jurisdiction of such matters and can obtain jurisdiction of the parties.").  While the exact source of law entitling Plaintiffs to relief, if any, is as yet undetermined, see infra Part V., this action is primarily for personal injury or death.  Indeed, 28 U.S.C. § 1605(a)(7) only permits jurisdiction of civil actions for "personal injury or death," which this is one.  Since this Court has jurisdiction over the subject matter and in personam, and the cause of action of is transitory, this is a proper venue.[19]

For all of these reasons, the Republic of Sudan's Motion to Dismiss for improper venue is **DENIED**.

---

[19]It should be noted that Sudan has not leveled any allegation that litigating in this venue undermines public policy, is incapable of affording adequate relief to either party, or an alternative forum is better than this one.  See Kontoulas v. A.H. Robins Co., Inc., 745 F.2d 312, 315 (4th Cir. 1984) (discussing the common law *forum non conveniens* doctrine).  Even had Sudan so contended, there is no basis for such an argument.

## V.      FAILURE TO STATE A CLAIM

While the FSIA vests jurisdiction in federal courts to hear cases involving foreign states, the FSIA does not, in and of itself, afford plaintiffs with a substantive cause of action for which they are entitled to a remedy.  See 28 U.S.C. § 1606 ("As to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances . . ."); First Nat'l City Bank v. Banco Para El Cercio Exterior de Cuba, 462 U.S. 611, 620 (1983) ("The language and history of the FSIA clearly establish that the Act was not intended to affect the substantive law determining the liability of a foreign state or instrumentality . . . ").  The D.C. Circuit has explicitly held that 28 U.S.C. § 1605(a)(7) does not "create[] a private right of action against a foreign government," but rather "merely waives the immunity of a foreign state without creating a cause of action against it . . . ."  Cicippio-Puleo, 353 F.3d at 1033.  It is for this reason that, in FSIA cases, "[t]he first inquiry is whether there has been a waiver of sovereign immunity.  If there has been such a waiver, as in this case, the second inquiry comes into play–that is, whether the source of substantive law upon which the claimant relies provides an avenue for relief."  FDIC v. Meyer, 510 U.S. 471, 484 (1994).

In accordance with this framework, in addition to the jurisdictional allegations addressed above, Plaintiffs' Complaint alleges that they are entitled to relief under the following sources of substantive law: 1) state common law or statutory law for wrongful death for the State of residence for each victim killed in the bombing of the USS Cole; 2) state common law or statutory law for intentional infliction of mental or emotional distress for each Plaintiff; 3) state

common law or statutory law for battery for each Plaintiffs' decedent; 4) federal common law for loss of solatium for each Plaintiff as set forth in Surrette v. Islamic Republic of Iran, 231 F. Supp.2d 260 (D.D.C. 2002); and, 5) the Restatement of Torts (Second) § 46(2).  (Proposed Am. to Supp. Am. Compl. at 2, Pt. VI, Doc. No. 28.)  Under these sources of law, Plaintiffs contend that they are entitled to damages for loss of solatium or consortium, loss of love, affection, companionship, advice, and comfort as a consequence of wrongful death (Am. Compl. ¶ 32, Doc. No. 10), and for loss of support due to the loss of earnings and earning capacity.  (Proposed Am. to Supp. Am. Compl. at 2, Pt. II, Doc. No. 28.)

The Republic of Sudan counters that the only proper source of law for Plaintiffs' action is the Death on the High Seas of Act ("DOHSA"),[20] which permits civil actions by personal representatives claiming damages for wrongful death occurring on the high seas, "in the district courts of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative against the vessel, person, or corporation which would have been liable if death had not ensued."  See 46 U.S.C. app. § 761.  Sudan argues that the DOHSA supplies the exclusive remedy in this instance.  See Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207, 228 (1986).  Furthermore, Sudan contends that Plaintiffs' claim is barred by the DOHSA's three-year statute of limitations.  46 U.S.C. app. § 763a.  Accordingly, Sudan urges dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6).

It is premature for this Court to reach the issue of what substantive source of law, if any, would entitle Plaintiffs to relief under the facts pled in the Complaint.  It is equally premature to

---

[20]Death on the High Seas Act ("DOHSA"), Mar. 30, 1920, ch. 111, 41 Stat. 537, 46 U.S.C. app. §§ 761-62, 764-67.

decide whether the DOHSA applies to this case and, if it does, whether it supplies Plaintiffs with the exclusive substantive cause of action.  As the D.C. Circuit has emphasized, "sovereign immunity is immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits."  Foremost-McKesson, Inc., 905 F.2d at 443 (internal quotations omitted).  Deciding what substantive law applies to this case prior to affording Sudan the opportunity to pursue an interlocutory appeal of the threshold jurisdictional issues raised by the present Motion, see supra note 6, would effectively impose upon it the burdens of litigation prior to conclusive resolution of this Court's jurisdiction.  Once Sudan pursues an interlocutory appeal on the question of jurisdiction, or decides not to, it will be appropriate to resolve the issue of what substantive source of law applies to Plaintiffs' claims.  Accordingly, this question will be held under advisement until after Sudan answers the Complaint, if it ultimately must do so.

Moreover, even if the Court did resolve the dispute over what substantive source of law applies in this case, if any, the Court still could not resolve Defendants' statute of limitations plea at this juncture.  The statute of limitations is an affirmative defense.  Fed. R. Civ. P. 8(c).  Determining the point when a cause of action accrues for purposes of triggering the applicable limitations period, deciding whether a claim is subject to equitable tolling, and ascertaining whether the limitations period has expired, are mixed questions of law and fact that cannot be settled on the pleadings alone.  A claim should only be dismissed under the applicable limitations period "if undisputed facts establish the time when the cause of action accrued."  American Hotel Mgmt. Assoc., Inc. v. Jones, 768 F.2d 562, 568 (4th Cir. 1985).  When there is a dispute over the facts related to the limitations period, the issue must ultimately be resolved by a trier of fact.  See Brown v. American Broadcasting Co., Inc., 704 F.2d 1296, 1304 (4th Cir. 1983) ("[T]he issue of

46

when plaintiff knew, or reasonably should have known of the existence of her cause of action, is

a question to be resolved by a jury.").  In this case, even if the DOHSA was held up as the sole

source of Plaintiffs' cause of action, they contend that the limitations period has not yet expired

based on when they learned of Defendant's alleged material support to Al-Qaeda.  (See Pl.'s

Memo. in Opp. at 27, Doc. No. 44.)  See also White v. Mercury Marine, Div. of Brunswick, Inc.,

129 F.3d 1428, 1432-33 (11th Cir. 1997) (holding that a DOHSA cause of action accrues when a

plaintiff knew or should have known of his injury and its cause).  This is an issue of fact that

cannot be resolved on the pleadings alone.

For all of these reasons, the best course is to take the Motion to Dismiss for failure to

state a claim upon which relief can be granted, and all the issues presented therein, **UNDER**

**ADVISEMENT** until sometime after Sudan answers the Complaint, if it ultimately must do so.


## VI.    CONCLUSION AND ORDER

For the foregoing reasons,

1)    Defendant's Motion to Dismiss for lack of jurisdiction over the subject matter,
      lack of jurisdiction over the person, improper venue, insufficiency of process, and
      insufficiency of service of process, is **DENIED** on each ground;

2)    Defendant's Motion to Dismiss for failure to state a claim upon which relief can
      be granted is **TAKEN UNDER ADVISEMENT** until sometime after Defendant
      files an answer to the Complaint, if it ultimately must do so;

3)    Defendant's Motion to Extend the Date for Filing Defendant's Answer to
      Plaintiffs' Amended Complaint, which is unopposed by Plaintiffs, is **GRANTED**,
      subject to the following conditions:

      a)    Defendant is **ORDERED** to answer Plaintiffs' Complaint not more
            than ten (10) days from the date of this Memorandum Opinion and
            Order; or

47

b)      In the event that this matter is stayed for an interlocutory appeal, and in the event that the appeal is denied, Defendant is **ORDERED** to answer Plaintiffs' Complaint not more than three (3) days from the date of the issuance of the mandate from the United States Court of Appeals.  <u>See</u> Fed. R. App. P. 41.

The Clerk of the Court is **DIRECTED** to transmit a copy of this Memorandum Opinion

and Order to all counsel of record via United States mail.  The Clerk of the Court is further

**DIRECTED** to also transmit a copy of this Memorandum Opinion and Order to the lead counsel

of record via facsimile.

**IT IS SO ORDERED.**

_____/s/_____
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia

August, 26, 2005